# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CYNTHIA TERRAZAS, | CASE NO. 1:10-cv-00113-SMS |
| Plaintiff, | |
| v. | ORDER AFFIRMING AGENCY'S DENIAL OF BENEFITS |
| MICHAEL ASTRUE, Commissioner of Social Security, | |
| Defendant. | |

Plaintiff Cynthia Terrazas, by her attorneys, Law Offices of Lawrence D. Rohlfing, seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits under Title II of the Social Security Act (42 U.S.C. § 301 *et seq.*) (the "Act"). The matter is currently before the Court on the parties' cross-briefs, which were submitted, without oral argument, to the Honorable Sandra M. Snyder, United States Magistrate Judge.[1] Following a review of the complete record and applicable law, this Court affirms the Commissioner's decision.

I. **Administrative Record**

   A. **Procedural History**

On September 29, 2004, Plaintiff filed for Title II disability insurance benefits, alleging disability beginning June 4, 2004. Her claim was denied initially on April 7, 2005, and upon reconsideration, on September 2, 2005. On October 20, 2005, Plaintiff filed a timely request for a

---

[1] Both parties consented to the jurisdiction of a United States Magistrate Judge (Docs. 7 & 8).

hearing.  Plaintiff appeared and testified at a hearing on March 8, 2007.  On September 29, 2007, Administrative Law Judge James M. Mitchell ("ALJ") denied Plaintiff's application.  The Appeals Council denied review on November 20, 2009.  On January 14, 2010, Plaintiff filed a complaint seeking this Court's review.

**I.      Agency Record**

In a 1974 motor vehicle accident while "off-roading," Plaintiff's right leg was crushed, including a fractured femur.  Plaintiff (born October 16, 1957) was left in chronic pain, with her right leg 1.75 inches shorter than her left leg.  After reaching adulthood, she worked as a bookkeeper and office clerk.

In 1999, Plaintiff had arthroscopic debridement (clean-out) of her right knee, a procedure that had previously relieved her pain.  In 2001 and 2002, Plaintiff had reconstructive surgeries on both feet, apparently to repair bunions, although Plaintiff testified that the surgery was intended to resolve her right flat foot.

Plaintiff alleged that she stopped working on August 19, 2004, because of right knee pain and knee replacement surgery, carpal tunnel syndrome, and a deformed right knee and knee arthritis.  She contended that her pain medications left her unable to work.

Supporting Plaintiff's September 2004 claim for state disability benefits, Alfred J. Coppola, Jr., M.D., opined that, even after the summer rest period, Plaintiff was disabled from returning to her occupation as a teacher.

In October 2004, Edward J. McPherson, M.D. performed knee replacement surgery on Plaintiff's right knee.  When she was discharged from the hospital, her weight bearing activities were not limited.

On October 26, 2004, Coppola advised American Fidelity Assurance Company, Plaintiff's private disability carrier that Plaintiff could not continue to work due to shortening and deformity of her right leg and arthritis in her right knee.  Coppola characterized Plaintiff's disability as permanent.

By late November 2004, McPherson noted that Plaintiff was content, could walk five blocks, and used a cane.  Her knee had mild edema and mild warmth, and a smooth range of

motion. Her calves were smooth, not tender, and had no cords. McPherson released Plaintiff to drive.

In a physical therapy report dated November 22, 2004, therapist Albert Vigil noted that Plaintiff reported only intermittent pain, reaching a level of 5/10. She took pain medication as needed. The range of motion in Plaintiff's knee was limited, however, and she could not kneel, squat, or go up or down stairs. She was able to walk bearing full weight with only a mild limp. Vigil opined that Plaintiff would continue to improve with further therapy.

In December 2004, Plaintiff was injured when she fell over a board that she had placed across a doorway to restrain a puppy. The record includes nothing to indicate that she then sought medical treatment.

On January 17, 2005, McPherson wrote to Plaintiff's former employer, advising them that she was permanently disabled. On February 25, 2005, McPherson prepared a letter to Sallie Mae in support of Plaintiff application to discharge her student loan. McPherson reported that Plaintiff was permanently disabled despite her recent knee replacement.

At a follow-up examination on February 28, 2005, Plaintiff reported that the pain had improved and that her back pain was relieved. McPherson observed that, despite a fall in December that injured Plaintiff's left knee, the left knee maintained medial and lateral joint spaces, with no fractures. All components in the right knee were well fixed. Her back posture was also much better. According to McPherson, Plaintiff was "definitely doing better," but needed to work on endurance and stress the knee to build up drainage channels. He recommended that Plaintiff walk a mile two to three times a week and do stationary bike riding. Plaintiff was to wean herself from Norco[2] and begin to use Naproxen[3] as needed.

///

---

[2] Norco is a brand name for hydrocodone and acetaminophen. Hydrocodone is a narcotic pain reliever, the performance of which is enhanced by the non-narcotic acetaminophen. The combination of hydrocodone and acetaminophen is used to relieve moderate to severe pain. It may be habit forming. www.drugs.com/hydrocodone.html (March 23, 2011).

[3] Naproxen is a nonsteroidal anti-inflammatory drug used to relieve pain, tenderness, swelling, and stiffness caused by arthritis, among other conditions. www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000526 (March 23, 2011). It is available without prescription.

3

In a medical source statement dated February 28, 2005, McPherson opined that Plaintiff could occasionally and frequently lift less than ten pounds due to leg pain and instability, stand or walk two hours in an eight-hour day due to leg pain with swelling, and sit two hours in an eight-hour day due to leg pain with swelling. She could occasionally climb or balance and could rarely ("almost never") stoop, kneel, or crouch. She could never crawl. Plaintiff could frequently reach, handle, finger, and feel.

In a pain questionnaire dated March 17, 2005, Plaintiff reported a variety of continuous pain in her lower back and hips, as well as headaches. She took hydrocodone and acetaminophen two or three times each day, which relieved the pain within 30-45 minutes but caused dizziness and drowsiness. She also relieved her pain with therapeutic exercise, elevation, rest, and ice. Plaintiff reported that she could not stand more than 20-30 minutes, sit more than 30 minutes, walk more than three blocks without a cane, exercise regularly, bend, kneel, or lift more than ten pounds. She did no vacuuming, climbing, or lifting.

After reviewing the agency file in March 2005, George W. Bugg, M.D., opined that Plaintiff could occasionally lift twenty pounds and frequently lift ten pounds; stand or walk two to four hours in an eight-hour day and sit six hours in an eight-hour day.

X-rays from May 2005 revealed normal joints, normal bones, and normal soft tissues in Plaintiff's shoulders. In June 2005, x-rays revealed minimal degeneration of the acromioclavicular joint in Plaintiff's right shoulder, with no gross bone or joint abnormalities. Other x-rays revealed that Plaintiff's lumbar vertebrae were well-aligned; the intervertebral body spacing was within normal limits; there was no scoliosis or rotoscoliosis or lumbar instability, and no significant facet arthropathy. Treating orthopedist Marshall S. Lewis, M.D., reported that Plaintiff's hips were level.

Magnetic resonance imagery showed mild degenerative changes of the AC joint in an otherwise normal shoulder. Vertebral bodies were normally aligned; paraspinal tissues were normal; there was mild and small disc protrusion at a few levels; there was no subluxation, pathologic marrow infiltration, or fracture; but there was a small amount of subcutaneous edema.
///

Lewis prescribed a conservative course of physical therapy for Plaintiff's right shoulder and acupuncture.

In June 2005, Neurologist George S. Pineda, M.D. characterized the results of testing as revealing very mild carpal tunnel syndrome.

In a disability report dated June 3, 2005, Plaintiff complained of constant pain and problems concentrating. The deformity and arthritis in her right knee prevented her "from doing any type of daily activities." AR 96.

In a June 17, 2005 pain questionnaire, Plaintiff reported constant pain in her lower back and left hip, which she treated with hydrocodone and acetaminophen three times a day. The medication caused drowsiness and dizziness. Pain caused Plaintiff to stop activity every 20-30 minutes. She could walk ½ block outside her home, could stand for 10-15 minutes at a time, and could sit 30 minutes at a time. Because of her pain medication, she was no longer driving.

On June 30, 2005, Plaintiff saw Lewis to follow up on her shoulder. An MRI revealed it to be normal, except for some mild degenerative changes. Lewis prescribed no additional medication and recommended acupuncture and physical therapy.

In a disability report dated September 11, 2005, Plaintiff complained of worsened chronic pain in her lower back and right shoulder, as well as carpal tunnel in both hands. She could not lift more than one or two pounds, stand more than fifteen or twenty minutes, write, or work at a computer. She was often unable to sleep. She attributed the worsening of her pain to her December 2004 fall. Her medications included hydrocodone, Mobic,[4] Benezepril,[5] Estradiol,[6]

---

[4] Mobic (meloxicam) is a nonsteroidal anti-inflammatory drug used to relieve the pain, tenderness, swelling, and stiffness of arthritis. www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000173/ (March 23, 2011).

[5] Benezepril is an ACE inhibitor used alone or with other medications to treat high blood pressure. . www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000903/ (March 23, 2011).

[6] Estradiol is a form of estrogen, used to treat the symptoms of menopause and to prevent osteoporosis in postmenopausal women. www.drugs.com/estradiol.html (March 23, 2011).

1  Medroxypr,[7] Triamterene,[8] and Klor-Con.[9]

2      At a October 2005 follow-up, Lewis prescribed no further treatment, finding medication
3  sufficient to treat Plaintiff's pain.

4      In February 2006, Plaintiff complained to Pineda of pain down the front of her leg.
5  Testing revealed normal nerve conduction and no findings of peripheral neuropathy.

6      Also in February 2006, Plaintiff complained to Lewis of left elbow pain.  X-rays revealed
7  slight bone periosteum[10] reaction without other gross bone or joint abnormalities.  Lewis
8  prescribed Flexeril[11] and a forearm splint (brace). Even though Plaintiff had been wearing the
9  splint incorrectly, she had greatly improved by March 2006, and no further treatment of her elbow
10 was ordered.

11     In April 2006, Plaintiff told Lewis that her elbow was better but her left hip hurt.  Lewis
12 ordered no treatment.

13     When Plaintiff complained of foot pain in May 2006, podiatrist John C. Zimmerman
14 recommended use of a bone stimulator.

15     In July 2006, Plaintiff again complained to Lewis of elbow pain.  An MRI revealed small
16 olecranon bursitis, and thickening and tendinitis of the common extensor tendon.  Because the
17 tendon was not torn, Lewis advised Plaintiff to continue with conservative care and ordered no
18 other treatment.

---

[7] Medroxypr (medroxyprogesterone) is a derivative of progesterine used to treat amenorrhea and abnormal uterine bleeding, and to prevent endometrial hyperplasia (growth of uterine lining) in post menopausal women taking conjugated estrogens.  www.medicinenet.com/medroxyprogesterone/article.htm (March 23, 2011).

[8] Triamterene is used alone or with other medications to treat fluid retention caused by various conditions, including liver and heart disease.  www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000653 (March 23, 2011).

[9] Klor-con (potassium chloride) is a mineral used to treat low blood levels of potassium. www.drugs.com/mtm/klor-con.html (March 23, 2011).

[10] The periosteum is the fibrous membrane that covers the outer surface of bones, except for the cartilage in the joints, and serves as an attachment for muscles and tendons. medical-dictionary.thefreedictionary.com/periosteum (March 22, 2011).

[11] Flexeril (cyclobenzaprine) is used with rest, physical therapy, and other treatment to relax muscles and relieve pain and discomfort cause by sprains, strains, and other muscle injuries. www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000699 (March 22, 2011).

Bone density tests in August 2006 revealed that Plaintiff had normal bone density in her spine, hips, and both thigh bones.

On August 2, 2006, Arturo Palencia, M.D., of the Pain Institute of California, evaluated Plaintiff's claims of back pain. Among his recommendations were the use of a shoe lift to resolve the disparity in the length of Plaintiff's legs and improve her ability to walk.

In September 2006, Zimmerman reported that Plaintiff's left foot seemed to be improving. He performed surgery to remove the hardware (two titanium screws) in her right foot, however.

In September 2006, Plaintiff reported only mild elbow pain. Lewis observed, however, that Plaintiff's complaints of pain were out of control and that she had obtained a multitude of medications, many of which were duplicative, from various physicians. He noted that Plaintiff was then taking two separate muscle relaxers (Tizanidine[12] and Skelaxin), and neuropathic pain medications, chronic pain medications, and acute pain medications, including Neurontin,[13] hydrocodone, and Ultram.[14] Lewis cautioned Plaintiff about taking such large quantities of medication and refused to prescribe anything else.

In October 2006, Lewis described Plaintiff as feeling better, with no acute distress.

In November 2006, Zimmerman described Plaintiff's left foot as having persistent nonunion. In January 2007, Plaintiff reported to Zimmerman that the pain in her left foot was "very tolerable."

**Plaintiff's testimony.** Plaintiff testified that she had severe pain in her right leg and her left hip down past her left knee, left elbow, right shoulder, both arms, neck, chest, stomach, wrists, hands, left hip, both feet, and lower back. The pain was "very high" and "[s]tabbing, shooting, aching, stinging." She experienced pain in every position, although lying down was

---

[12] Tizanidine is a skeletal muscle relaxant used to relieve muscle spasms and increased muscle tone cause by multiple sclerosis, stroke, or a brain or spinal injury. www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000106 (March 23, 2011).

[13] Neurontin (gabapentin) is an anticonvulsant used to relieve certain types of seizures and to relieve the pain of postherpetic neuralgia (shingles). www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000940 (March 23, 2011)

[14] Ultram (tramadol) is an opiate antagonist used to relieve moderate to moderately severe pain in patients expected to experience round-the-clock pain for an extended period. www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000960 (March 23, 2011)

7

easier. Plaintiff suffered from headaches. She needed to keep her right leg elevated constantly. Plaintiff took pills to help her sleep. She had carpal tunnel in both hands and was awaiting surgery. She could not lift her right arm overhead, and could not bend her left arm because she wore a brace. She could not reach to the side with either arm. The pain in her hands made it difficult to hold things and to write. She could not hold a phone.

Her medications made her drowsy and impaired her concentration.

Plaintiff prepared one or two meals a day but did no housework or shopping. She paid attention to television about four hours a day and read the newspaper for a half hour. She visited with relatives or friends once a week. The rest of the time she "t[ook] it easy." Plaintiff does not drive and, except for doctor's appointments, she does not leave her home. She took several naps a day.

As directed by her physician, Plaintiff could only lift a few pounds. She could stand from ten to fifteen minutes and could sit no more than twenty minutes. She could walk one block. Her back was so painful that she could not bend over and needed help putting on her socks and shoes.

**Vocational expert testimony.** Vocational expert Kevin Ferra testified that Plaintiff was capable of performing her previous jobs: office clerk (light and semiskilled) and bookkeeper (sedentary and skilled). The general clerical skills that Plaintiff acquired in these positions would be transferable to other clerical positions.

For the first hypothetical question, the ALJ directed Ferra to assume a 49-year-old individual who had completed high school and three semesters of college, had Plaintiff's work history, and could lift, push or pull twenty pounds occasionally and ten pounds frequently; could walk or stand frequently; could sit, stop or bend occasionally. Ferra opined that such a person could perform Plaintiff's previous jobs or could work as a cashier II (180,000 jobs in California), sales attendant (71,000 jobs in California), or cleaner (20,000 jobs in California).

For hypothetical question two, the ALJ directed Ferra to make the same assumptions as those set forth in hypothetical question one, plus consider a person unlimited in attention, concentration, understanding, and memory; with diminished by correctable vision; unlimited hearing; slightly limited in overhead and side reach with both extremities; slightly limited in front

8

reach with the left arm; slightly limited fine and gross manipulative abilities; slight limitations in performing a simple, routine, repetitive task; no environmental limitations; unlimited public contact; occasional supervision; and slight to moderate pain. Again Ferra opined that such a person could perform Plaintiff's prior jobs or the jobs listed for hypothetical one.

For hypothetical question 2A, the ALJ directed Ferra to assume that the person was slightly limited in attention, concentration, understanding and memory; moderately limited in overhead and side reach with both extremities; moderately limited in front reach with the left extremity, and moderately limited in fine and gross manipulative abilities. Ferra opined that such a person could neither perform Plaintiff's prior jobs nor the jobs listed in response to hypothetical question 1.

For hypothetical question 3, the ALJ directed Ferra to assume a 49-year individual with a high school education, three semesters of college, and Plaintiff's work history, who could lift, push, and pull ten pounds occasionally, and five pounds frequently; walk, stand, stoop, and bend occasionally; and sit frequently. Ferra responded that the hypothetical individual could perform Plaintiff's prior position as a bookkeeper, as well as the semiskilled positions of receptionist (200,000 jobs in California) and general office clerk (175,000 positions in California), and the unskilled positions of assembler (16,000 positions in California) and quotation clerk (6,000 positions in California).

For hypothetical question 4, the ALJ directed Ferra to assume that the individual was unlimited in attention, concentration, understanding, and memory; diminished but correctable vision; unlimited hearing; slightly limited overhead and front reach with both arms; slightly limited side reach with the left dominant arm; slightly limited fine and gross manipulative abilities with both hands; slightly limited ability to do a simple, routine task; no environmental restrictions; unlimited public contact; occasional supervision; and slight to moderate pain. Ferra opined that the hypothetical person could perform Plaintiff's former position as a bookkeeper as well as all of the positions noted in response to the previous hypothetical questions.

For hypothetical question 4A, the ALJ directed Ferra to assume that the individual was slightly limited in attention, concentration, understanding, and memory; moderately limited in

overhead and side reach with both arms; moderately limited in side reach with the left dominant arm; and moderately limited in both fine and gross manipulative abilities with both hands. Ferra opined that the hypothetical individual could not perform Plaintiff's former position as bookkeeper nor any other job mentioned in the previous hypothetical questions.

## II.     Discussion

### A.     Legal Standards

To qualify for benefits, a claimant must establish that he or she is unable to engage in substantial gainful activity because of a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c (a)(3)(A). A claimant must demonstrate a physical or mental impairment of such severity that he or she is not only unable to do his or her previous work, but cannot, considering age, education, and work experience, engage in any other substantial gainful work existing in the national economy. *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).

To encourage uniformity in decision making, the Commissioner has promulgated regulations prescribing a five-step sequential process for evaluating an alleged disability. 20 C.F.R. §§ 404.1520 (a)-(f); 416.920 (a)-(f). The process requires consideration of the following questions:

Step one:     Is the claimant engaging in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.

Step two:     Does the claimant have a "severe" impairment? If so, proceed to step three. If not, then a finding of not disabled is appropriate.

Step three:   Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1? If so, the claimant is automatically determined disabled. If not, proceed to step four.

Step four:    Is the claimant capable of performing his past work? If so, the claimant is not disabled. If not, proceed to step five.

Step five:    Does the claimant have the residual functional capacity to perform any other work? If so, the claimant is not disabled. If not, the claimant is disabled.

*Lester v. Chater*, 81 F.3d 821, 828 n. 5 (9th Cir. 1995).

///

The ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of June 4, 2004. Plaintiff's severe combination of impairments was obesity; asthma; status post metatarsal fracture and complex mid-shaft femoral fracture in 1974, with a persistent post healing 20º varus grafts and leg length discrepancy; advanced osteoarthritis of the medial compartment of the right knee with status post total right knee replacement in October 2004; mild degenerative changes of the lumbar spine and right acromioclavicular (AC) joint; mild sacroiliitis and iliac tendinitis; mild bilateral carpal tunnel syndrome; lateral epicondylitis of the left elbow; and status post right foot surgery in remote past with hardware removal in 2006. Her impairment did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpt. P. Appendix 1 (20 C.F.R. §§ 416.920(d), 416.925, and 416.926). Plaintiff had past relevant work as a bookkeeper.

**B.      Scope of Review**

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act. In reviewing findings of fact with respect to such determinations, a court must determine whether substantial evidence supports the Commissioner's decision. 42 U.S.C. § 405(g). Substantial evidence means "more than a mere scintilla" (*Richardson v. Perales*, 402 U.S. 389, 402 (1971)), but less than a preponderance. *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n. 10 (9th Cir. 1975). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401. The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's decision. *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985). In weighing the evidence and making findings, the Commissioner must apply the proper legal standards. *See, e.g., Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988). This Court must uphold the ALJ's determination that the claimant is not disabled if the ALJ applied the proper legal standards, and if the ALJ's findings are supported by substantial evidence. *See Sanchez v. Secretary of Health and Human Services*, 812 F.2d 509, 510 (9th Cir. 1987). The scope of review requires this Court to consider the record as a whole, examining both the evidence supporting the ALJ's decision and the evidence that does not.

1  **C.   Did the ALJ Err in Failing to Find that Plaintiff had an impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1?**

Plaintiff contends that the ALJ should have found Plaintiff disabled at Step 3 since she met the requirements of listing 1.06 of 20 C.F.R., Pt. 404, Subpt. P, App. 1. Defendant counters that because Plaintiff failed to advance this claim below, she cannot now argue that the ALJ erred in failing to make such a finding. Following its review of the record, the Court agrees that Plaintiff did not raise this issue below. In any event, because the ALJ's findings were tantamount to a finding that Plaintiff was able to ambulate effectively as defined by the regulation, Plaintiff's impairment cannot be said to meet the listing requirements.

Although Plaintiff alleged multiple musculoskeletal impairments, this issue focuses solely on the deficient healing of Plaintiff's left "bunionectomy." Category 1.06 of Impairments, Musculoskeletal provides:

> 1.06 *Fracture of the femur, tibia, pelvis, or one or more of the tarsal bones.* With:
>
> A. Solid union not evident on appropriate medically acceptable imaging and not clinically solid; and
>
> B. Inability to ambulate effectively, as defined in 1.00B2b, and return to effective ambulation did not occur or is not expected to occur within 12 months of onset.

Section 1.00(B)(2)(b) provides:

> (b) *What we mean by Inability to Ambulate Effectively*
>
> (1) *Definition*. Inability to ambulate effectively means an extreme limitation of the ability to walk; *i.e.*, an impairment(s) that interfere very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (*see* 1.00J) to permit independent ambulation without the use of hand-held assistive device(s) that limits the functioning of both upper extremities. (Listing 1.05C is an exception to this general definition because the individual has the use of only one upper extremity due to amputation of a hand.)
>
> (2) *To ambulate effectively*, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out the activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include , but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's

12

home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

Although Plaintiff's podiatrist, Dr. Zimmerman, described Plaintiff's left foot as having persistent nonunion, in January 2007, Plaintiff described the pain in her left foot as "very tolerable." Although hardware was removed from Plaintiff's right foot, it remained in Plaintiff's left foot to stabilize the nonunion. Zimmerman directed Plaintiff to use a bone stimulator to encourage the gradual regrowth of the bone. Contrary to the assertion in Plaintiff's brief, Zimmerman did not characterize the nonunion as permanently disabling of itself, but simply opined that Plaintiff should pursue a finding of permanent disability in light of her "multiple extremity problems."

The ALJ found that Plaintiff could walk up to two hours in an eight-hour workday. His finding was supported by substantial evidence in the record. In November 2004, about a month after her knee replacement surgery, Dr. McPherson noted that Plaintiff was able to walk five blocks and released her to drive. At about the same time, Albert Vigil, her physical therapist, noted that she could walk bearing her full weight with only a slight limp. Vigil added that, although Plaintiff then had a limited range of motion and could not kneel, squat, or go up or down stairs, she would continue to improve with further therapy. In his notes from February 2005, McPherson recorded that he directed Plaintiff to wean herself from pain killers and walk a mile two or three times a week and ride a stationary bicycle. In a statement prepared later that month, McPherson opined that Plaintiff could walk two hours in an eight-hour workday. In March 2005, Plaintiff herself reported that she could not walk more than three blocks without a cane, implying that she could walk with a cane thereafter. In March 2005, Dr. Bugg, an agency physician, opined that Plaintiff could walk two to four hours in an eight-hour day.

Accordingly, although Plaintiff had a nonunion of her foot bone, substantial evidence supported a finding that Plaintiff could ambulate effectively. Accordingly, her impairment did not satisfy the regulatory listing.

///

///

13

**D.     Did the ALJ Err in Concluding That Plaintiff's Subjective Complaints Were Not Credible?**

Plaintiff contends that the ALJ failed to provide clear and convincing reasons for rejecting Plaintiff's subjective pain complaints. The Commissioner counters that the ALJ, who did not fully reject Plaintiff's testimony, properly supported his conclusion that Plaintiff was not fully credible. This Court agrees with the Commissioner.

An ALJ is not "required to believe every allegation of disabling pain" or other non-exertional requirement. *Orn v. Astrue*, 495 F.3d 625, 635 (9th Cir. 2007), *quoting Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989). But if he or she decides to reject a claimant's pain testimony after a medical impairment has been established, the ALJ must make specific findings assessing the credibility of the claimant's subjective complaints. *Ceguerra v. Secretary of Health and Human Services*, 933 F.2d 735, 738 (9th Cir. 1991). "[T]he ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Lester*, 81 F.3d at 834, *quoting Varney v. Secretary of Health and Human Services*, 846 F.2d 581, 584 (9th Cir. 1988). He or she must set forth specific reasons for rejecting the claim, explaining why the testimony is unpersuasive. *Orn*, 495 F.3d at 635. *See also Robbins v. Social Security Administration*, 466 F.3d 880, 885 (9th Cir. 2006). The credibility findings must be "sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002).

When weighing a claimant's credibility, the ALJ may consider the claimant's reputation for truthfulness, inconsistencies in claimant's testimony or between her testimony and conduct, claimant's daily activities, claimant's work record, and testimony from physicians and third parties about the nature, severity and effect of claimant's claimed symptoms. *Light v. Social Security Administration*, 119 F.3d 789, 792 (9th Cir. 1997). The ALJ may consider "(1) ordinary techniques of credibility evaluation, such as claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities." *Tommasetti v. Astrue*, 533

14

1  F.3d 1035, 1039 (9th Cir. 2008), *citing Smolen v. Chater*, 80 F.3d 1273 (9th Cir. 1996).  If the

2  ALJ's finding is supported by substantial evidence, the Court may not second-guess his or her

3  decision.  *Thomas*, 278 F.3d at 959.

4          The Ninth Circuit has summarized the applicable standard:

> [T]o discredit a claimant's testimony when a medical impairment has been established, the ALJ must provide "'specific cogent reasons for the disbelief.'" *Morgan*, 169 F.3d [595,] 599 [9th Cir. 1999] (quoting *Lester*, 81 F.3d at 834).  The ALJ must "cit[e] the reasons why the [claimant's] testimony is unpersuasive." *Id.* Where, as here, the ALJ did not find "affirmative evidence" that the claimant was a malingerer, those "reasons for rejecting the claimant's testimony must be clear and convincing." *Id.* Social Security Administration rulings specify the proper bases for rejection of a claimant's testimony . . . An ALJ's decision to reject a claimant's testimony cannot be supported by reasons that do not comport with the agency's rules. *See* 67 Fed.Reg. at 57860 ("Although Social Security Rulings do not have the same force and effect as the statute or regulations, they are binding on all components of the Social Security Administration, . . . and are to be relied upon as precedent in adjudicating cases."); *see Daniels v. Apfel*, 154 F.3d 1129, 1131 (10th Cir. 1998) (concluding the ALJ's decision at step three of the disability determination was contrary to agency rulings and therefore warranted remand). Factors that an ALJ may consider in weighing a claimant's credibility include reputation for truthfulness, inconsistencies in testimony or between testimony and conduct, daily activities, and "unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment." *Fair*, 885 F.2d at 603; *see also Thomas*, 278 F.3d at 958-59.

*Orn*, 495 F.3d at 635.

        Here, the ALJ thoughtfully explained his reasons for discounting Plaintiff's credibility in great detail.  First (at AR 18-19), he discussed the inconsistency of Plaintiff's three pain reports. Plaintiff's first two pain reports, completed on March 17, and June 17, 2005, were nearly identical and did not mention any exacerbation of pain or difficulty with prolonged sitting.

> On September 11, 2005, the claimant added complaints of chronic pain throughout her entire body, including her hands, elbows, both knees, left hip, lower back, in both feet to her complaints, alleging that the additional symptoms had been present since December 28, 2004.  The claimant now also reported that she was unable to write without pain or tingling in her left hand and arm, and had to elevate her legs "very often," or virtually "all day" long.  The claimant did not explain why she failed to mention those areas of pain during the two previous pain questionnaires she had filled out <u>after</u> December 28, 2004, the day she was now alleging that these significant additional pain symptoms had begun.

AR 19.

        Emphasizing that Plaintiff's unconvincing testimony and demeanor at the hearing were but one factor in his conclusion to discount her credibility, the ALJ carefully analyzed Plaintiff's

15

testimony in light of objective medical evidence in the record and her complaints to her physician's as noted in the treatment records. *See* AR 23-25. He noted that, although many of her impairments had existed for many years, they had not previously interfered with her ability to perform light exertional work. In addition, her pain reports to her physicians were not consistent in nature and severity with the pain and inability to function reported to the agency. His analysis was supported by substantial evidence in the record and will not be disturbed.

### D. Did the ALJ Erroneously Fail to Give Controlling Weight to the Opinions of Treating Physicians?

Plaintiff maintains that the ALJ erred in rejecting the uncontroverted opinions of her treating physicians. The Commissioner responds that the ALJ properly evaluated the doctors' opinions. Again, this Court concludes that the ALJ's determination was supported by substantial evidence and proper analysis.

Three types of physicians may offer opinions in social security cases: "(1) those who treat[ed] the claimant (treating physicians); (2) those who examine[d] but d[id] not treat the claimant (examining physicians); and (3) those who neither examine[d] nor treat[ed] the claimant (nonexamining physicians)." *Lester*, 81 F.3d at 830. A treating physician's opinion is generally entitled to more weight that the opinion of a doctor who examined but did not treat the claimant, and an examining physician's opinion is generally entitled to more weight than that of a non-examining physician. *Id.* The Social Security Administration favors the opinion of a treating physician over that of nontreating physicians. 20 C.F.R. § 404.1527; *Orn*, 495 F.3d at 631. A treating physician is employed to cure and has a greater opportunity to know and observe the patient. *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987). Nonetheless, an ALJ may disregard the opinion of a treating physician even if it is uncontradicted. *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989). If the ALJ rejects the opinion of a treating physician, his determination must be supported by clear and convincing reasons. *Lester*, 81 F.3d at 830-31.

In particular, an ALJ is "not bound by an expert medical opinion on the ultimate question of disability." *Tomasetti*, 533 F.3d at 1041; Social Security Ruling 96-5p. "Although a treating physician's opinion is generally afforded the greatest weight in disability cases, it is not binding

on an ALJ with respect to the existence of an impairment or the ultimate determination of disability." *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001). Accordingly, the ALJ was not bound by the conclusory opinions of Plaintiff's treating physicians, addressed to various insurers, lenders, and Plaintiff's employer, that Plaintiff was totally disabled.

In addition, as the ALJ pointed out in his extensive and thoughtful analysis of the record, Plaintiff's treating physicians pronounced their ultimate determinations in contradiction of their own treating records and at times when an assessment of the future course of Plaintiff's impairment(s) was unclear. For example, on August 19, 2004, Plaintiff saw Dr. Coppola, complaining of increased knee pain. Coppola recommended a right knee replacement and suggested also correcting the disparity in the lengths of Plaintiff's legs. Coppola then opined, without any explanation, that Plaintiff was permanently incapable of performing more than two hours of work per day despite her having worked for many years with the sequelae of her motor vehicle accident and despite her impending knee replacement. Later medical records document a successful knee replacement, followed by reports of reduced pain and successful weight bearing and walking.

Similarly, Dr. McPherson repeatedly pronounced Plaintiff permanently disabled despite his own treatment notes indicating that the knee replacement surgery left Plaintiff with less knee pain and "dramatic relief" of her back pain. His February 28, 2005, opinions regarding Plaintiff's residual abilities were provided on a check-off form provided by Plaintiff's attorney and included no supporting explanations.

The regulations provide that medical opinions be evaluated by considering (1) the examining relationship; (2) the treatment relationship, including (a) the length of the treatment relationship or frequency of examination, and the (b) nature and extent of the treatment relationship; (3) supportability; (4) consistency; (5) specialization; and (6) other factors that support or contradict a medical opinion. 28 C.F.R. § 404.1527(d). The ALJ properly analyzed and applied the treating physician's opinions in light of the record as a whole.

///

///

### III. Conclusion and Order

The Court finds that the ALJ applied appropriate legal standards and that substantial credible evidence supported the ALJ's determination that Plaintiff was not disabled. Accordingly, the Court hereby DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security. The Clerk of Court is DIRECTED to enter judgment in favor of the Commissioner and against Plaintiff.

IT IS SO ORDERED.

**Dated:   March 28, 2011**                           /s/ Sandra M. Snyder
                                                                  UNITED STATES MAGISTRATE JUDGE